UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BEIJING SHOUGANG MINING INVESTMENT
COMPANY LTD., CHINA HEILONGJIANG
INTERNATIONAL ECONOMIC & TECHNICAL
COOPERATIVE CORP., and QINHUANGDAOSHI
QINLONG INTERNATIONAL INDUSTRIAL CO.
LTD,

        Petitioners,

     – against –

MONGOLIA,

        Respondent.

**OPINION & ORDER**

17 Civ. 7436 (ER)

Ramos, D.J.:

  For over a decade, the petitioners, a group of three Chinese companies, and respondent, the country of Mongolia, fought over the ownership of a valuable mining concession. Those proceedings started in the Mongolian court system, rose to its Supreme Court, jumped to an arbitration tribunal in New York, and, pause for now here, in the Southern District of New York. The Chinese companies move this Court to perform a de novo review of the arbitral tribunal's decision that the dispute between the parties was not arbitrable, vacate that decision, and compel the parties to return to arbitration for a decision on the merits. Mongolia cross-moves the Court to defer to the arbitrators' reasoning and confirm their award.

  The Chinese companies, by initiating this arbitration, affirmatively arguing for the tribunal's jurisdiction, and vigorously participating in the seven-year-long arbitration proceedings, have waived their opportunity to object now to the arbitrators' ability to decide arbitrability. The Court therefore finds that the parties clearly and unmistakably agreed to place the question of arbitrability before the tribunal, and the Court confirms the award after

performing a deferential review. Mongolia's motion is GRANTED. The Chinese companies' motion is DENIED.

I. BACKGROUND

In 1991, the Chinese and Mongolian governments signed the Agreement Between the Government of the Mongolian People's Republic and the Government of the People's Republic of China Concerning the Encouragement and Reciprocal Protection of Investments.[1] This bilateral investment treaty ("BIT") provides for the equal treatment of investments by the states, banned state expropriation of the investments of the other state's companies, and detailed the terms and procedures of arbitration should any disputes under the treaty arise. The treaty came into force in 1993.

One of the Chinese companies, Qinhuangdoaoshi Qinlong International Industrial Company Ltd. ("Qinlong"), formed a joint venture with a Mongolian partner in 2002 to develop an iron ore deposit in the Tumurtei region of northern Mongolia. Decl. of Michael A. Granne Ex. A ("Award") ¶ 91, Doc. 1. The other two companies — Beijing Shougang Mining Investment Company Ltd. and China Heilongjiang International Economic & Technical Cooperative Corp. — purchased equity in the joint venture from Qinlong in 2004. *Id.* ¶ 92. In 2005, the Mongolian partner transferred a license allowing the export of iron ore to the joint venture in 2005. *Id.* ¶ 90.

Over the course of 2006, Mongolian authorities scrutinized the operations of the joint venture, eventually revoking the license in September. *See generally* Award ¶¶ 150–76. The joint venture sued in a Mongolian court in November 2006, taking its case as high as the

---

[1] Available at http://tfs.mofcom.gov.cn/aarticle/h/at/201002/20100206778627.html (last visited Nov. 15, 2019). The Mongolian People's Republic was a predecessor Soviet satellite-state to the now-democratic state of Mongolia. Award ¶¶ 103, 106.

Supreme Court of Mongolia. *Id.* ¶ 179. Ultimately it was unsuccessful in regaining the mining license. *Id.* By 2009 — after a complex series of lawsuits involving several other companies and the Mongolian government — the license and land-use rights to the iron ore deposit came to rest with a Mongolian state-owned metallurgy company. *Id.* ¶¶ 184, 189. The Chinese companies initiated arbitration under article 8 of the BIT in February 2010 alleging that Mongolia had expropriated their investment in breach of article 4. *Id.* ¶¶ 6, 190.

The New York arbitration, featuring an ad-hoc panel of three arbitrators and hosted by the Permanent Court of Arbitration, continued for seven years. The Chinese companies submitted their memorial in March 2011. *Id.* ¶ 19. Mongolia responded with a counter-memorial in September, alleging counterclaims and objecting to the tribunal's jurisdiction over the companies' initial claims. *Id.* ¶ 21. In June 2012, the Chinese companies filed a reply to Mongolia's counter-memorial, raising their own objections to the tribunal's jurisdiction over the counterclaims. *Id.* ¶ 28. Mongolia responded with a rejoinder in December 2012. *Id.* ¶ 34. After a three-year pause due to discovery and a need to replace one arbitrator, the tribunal held a September 2015 hearing in the Netherlands. *Id.* ¶ 77.

The Chinese companies frequently and affirmatively argued for the ability of the arbitrators to hear this dispute. They never raised any objection to the arbitrators themselves deciding this question. They first raised the question of arbitrability before the tribunal in their petition to arbitrate. *See* Decl. of Michael A. Granne Ex. B, part V.3. In that petition, they argued for jurisdiction through the treaty's text and purpose. *See, e.g.*, *id.* ¶¶ 68, 69. They expanded upon those arguments in their memorial, adding citations to other international arbitrations. *See* Decl. of Michael D. Nolan Ex. 1 ¶¶ 60–88. Throughout that memorial, the companies explicitly "submitted" their arguments to the arbitrators and did not object to their

3

consideration of the question of arbitrability. *See, e.g.*, *id.* ¶ 61 ("The Claimants submit that the ordinary meaning of Article 8(3) in the context of the Treaty and in the light of its object and purpose can only be construed to the effect that the Arbitral Tribunal has jurisdiction . . . ."). Next, at a procedural conference a few months after the submission of the companies' memorial, the parties agreed to decide jurisdiction and merits at the same time, rather than bifurcating the issues. *Id.* ¶ 16. Then, after Mongolia responded to the jurisdictional arguments in its counter-memorial, the companies replied without raising objection to the arbitrators' ability to hear a dispute over jurisdiction. *See* Decl. of Michael D. Nolan Ex. 3 at 43–48.

The tribunal issued its award in June 2017. After determining that the Chinese companies had standing to bring an arbitral claim under the BIT, Award ¶¶ 442, the tribunal centered its analysis on whether the BIT allows an arbitral panel to determine a state's liability for expropriation, as opposed to the amount of compensation owed. *Id.* ¶ 423 (citing Mongolia's arguments at *id.* ¶¶ 252–68.). The tribunal began by interpreting the ordinary meaning of the relevant BIT provision in context and in light of its object and purpose. *Id.* ¶ 424 (citing the Vienna Convention on the Law of Treaties of 1969, art. 31(1)[2]). Based on the structure of the treaty, it found that the entirety of its jurisdiction was described by article 8(3) of the BIT, specifically, "dispute[s] involving the amount of compensation for expropriation." *Id.* ¶ 436.

The tribunal then focused on the meaning of this phrase, looking at the ordinary meaning of the words within it and its place within the structure of the treaty. Award ¶¶ 438–45. It determined that the phrase limits the jurisdiction of the tribunal to disputes over whether compensation already paid was adequate, not whether compensation was due in the first instance.

---

[2] Available at https://treaties.un.org/doc/Treaties/1980/01/19800127%2000-52%20AM/Ch_XXIII_01.pdf (last visited Nov. 18, 2019).

*See id.* ¶ 445. It supported its decision by distinguishing competing decisions from other arbitral tribunals and the Singapore Court of Appeal that found such an interpretation to render the provision without any legal effect. *Id.* ¶¶ 447–48. In doing so, it pointed out that arbitration can be commenced after the direct declaration of an expropriation by a government or indirect declaration through the Mongolian courts. *Id.* ¶¶ 448–49. Such a procedure, it held, was the choice of China and Mongolia when they negotiated the BIT and consistent with the object and purpose of the BIT. *Id.* ¶¶ 450–51. Based on this analysis, it rejected jurisdiction over both the Chinese companies' claims and the Mongolian counterclaims, closing the arbitration. *Id.* ¶ 477.

## II. RELEVANT LAW

A party seeking vacatur of an arbitral award may normally seek a de novo court review of questions of arbitrability, including questions of whether a given dispute falls within the ambit of an arbitration clause. *See Schneider v. Kingdom of Thailand*, 688 F.3d 68, 71 (2d Cir. 2012) (citing *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)). If, however, there is "clear and unmistakable evidence" that the parties agreed to arbitrate arbitrability, then courts are to review the tribunal's decision like any other arbitral decisions — with deference. *See First Options*, 514 U.S. 938, 943–44 (1995).

The limited grounds allowed for vacatur when an award is granted deference are outlined in the Federal Arbitration Act ("FAA"), 9 U.S.C. § 10, and — for awards involving foreign entities — in the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (the "New York Convention"), art. V.[3] For an award made in the United States involving foreign entities, a court may vacate it under a ground articulated in either the FAA or the New York Convention. *See Zurich Am. Ins. Co. v. Team Tankers A.S.*, 811 F.3d 584, 588 (2d

---

[3] Available at http://www.newyorkconvention.org/english (last visited Nov. 18, 2019).

Cir. 2016); *see also Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 23 (2d Cir. 1997) ("The [New York] Convention specifically contemplates that the state in which . . . the award is made, will be free to set aside or modify an award in accordance with its domestic arbitral law and its full panoply of express and implied grounds for relief.").

Confirmation of an arbitral award normally takes the form of a summary proceeding that converts a final arbitration award into a judgment of the court. *D.H. Blair & Co., Inc. v. Gottdiener,* 462 F.3d 95, 110 (2d Cir. 2006). The court is required to grant the award unless it is vacated, modified, or corrected. *Id.* (quoting 9 U.S.C. § 9). An application for a judicial decree confirming an award receives "streamlined treatment as a motion, obviating the separate contract action that would usually be necessary to enforce or tinker with an arbitral award in court." *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 582 (2008).

### III. THE COURT'S STANDARD FOR REVIEWING THE AWARD

The Court has conducted a review of the bilateral investment treaty forming the basis for the arbitration, and it has reviewed the conduct of the parties before the tribunal. It finds that, although the treaty itself does not contain clear and unmistakable evidence that the parties intended to place the question of arbitrability before the arbitrators, the Chinese companies' behavior during the arbitration does.

The treaty does not contain any explicit agreement regarding what body may decide the arbitrability of an issue. As proof of explicit agreement, Mongolia points to the first sentence of article 8(5): "The tribunal shall determine its own procedure." The country urges the Court to read it as a broad grant of power to the tribunal. The Court declines this invitation.

The word "procedure," by its plain meaning, does not encompass rules detailing jurisdiction. Black's Law Dictionary defines the term as, "A specific method or course of action," and, "The judicial rule or manner for carrying on a civil lawsuit or criminal prosecution."

*Procedure*, Black's Law Dictionary (11th ed. 2019). Similarly, although the Rules Enabling Act, 28 U.S.C. § 2072, authorizes the Supreme Court to "prescribe general rules of practice and procedure," the Act does not allow the Supreme Court to set the courts' jurisdiction; that task is handled separately by the U.S. Constitution and 28 U.S.C. §§ 1330, *et seq.*

In addition, other arbitration agreements construed by U.S. courts to commit the question of arbitrability to arbitrators do so differently. For example, the Second Circuit considered whether a BIT between the United States and Ecuador committed the question of arbitrability to an arbitral tribunal. *See Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 394 (2d Cir. 2012). It found the states had agreed to give the tribunal such power by agreeing to the use of the UN Commission on International Trade Law ("UNCITRAL") Arbitration Rules, which state that an arbitrator "shall have the power to rule on objections that it has no jurisdiction, including any objections with respect to the existence or validity of the . . . arbitration agreement." *Id.* There is no similar language in the Mongolia–China BIT that makes the committal of arbitrability determinations to the arbitrators clear. *See also* S*chneider v. Kingdom of Thailand*, 688 F.3d 68, 73 (2d Cir. 2012) (applying reference to UNCITRAL rules in arbitration terms between company and Thailand); *Contec Corp. v. Remote Solution Co.*, 398 F.3d 205, 208 (2d Cir. 2005) (applying reference to rules of the American Arbitration Association in a domestic arbitration agreement).

Instead, Mongolia primarily argues that the Chinese companies have acquiesced to the arbitrators' consideration of arbitrability through their conduct during the arbitration. Specifically, Mongolia argues that the Chinese companies brought the arbitration, that they made arguments in favor of arbitrability in their very first submission and that — while discussing arbitrability — they never so much as objected to the arbitrators' consideration. The companies

7

argue their behavior here does not rise to the level of "clear and unmistakable evidence" described in *First Options*, 514 U.S. 938, 944 (1995).

In *First Options*, the Supreme Court faced a motion to vacate an arbitration award brought by the respondents in the underlying arbitration. *Id.* at 940–41. During the arbitration itself, the respondents only participated by sending a single memo disputing the jurisdiction of the arbitrators because the respondents had never signed the arbitration agreement. *Id.* at 941. After the arbitration was complete, the respondents sought relief in the federal courts and asked that the courts conduct a de novo review of the arbitrators' decision that this dispute was arbitrable. *Id.* The Court ruled that, given their limited appearance, the respondents had not acquiesced to the arbitrator's ability to decide arbitrability and affirmed the lower court's de novo review. *Id.* at 946.

The facts of *First Options* are very different from the instant case. The *First Options* Court had in front of it respondents who opposed the formation of any arbitration agreement at all. There is no dispute that the BIT exists here. The *First Options* arbitration respondents participated only through a single memo objecting to arbitrability. The Chinese companies vigorously participated for seven years in the underlying arbitration.

The factor that most distinguishes this case, however, is the fact that the companies initiated the arbitration and argued for the arbitrators' jurisdiction from their very first submission. Unlike the *First Options* arbitration respondents, the Chinese companies had a choice about where, how, and under what bases to initiate this arbitration. Rather than go to a court and compel arbitration, they handed the questions to the arbitrator from the very beginning. This behavior constitutes waiver. See *Opals on Ice Lingerie v. Bodylines Inc.*, 320 F.3d 362, 368 (2d Cir. 2003) ("[I]f a party participates in arbitration proceedings without making a timely

8

objection to the submission of the dispute to arbitration, that party may be found to have waived its right to object to the arbitration.").

The Court's reasoning is buttressed by the result of a case facing Judge Marrero of this District in 2007, *In re Arbitration between Halcot Navigation Ltd. Partnership and Stolt-Nielsen Transp. Group*, 491 F. Supp. 2d 413 (S.D.N.Y. 2007). There, an arbitration respondent made a submission to the panel, asking that the parties submit briefing so that the arbitrability dispute could be heard by that panel. *Id.* at 417. Judge Marrero ruled that the respondent's attempt to have the district court review the tribunal's jurisdictional decision after the respondent had declined to object below, "create[d] a win-win outcome for itself, as a means of having it both ways, allowing the arbitrability issue to proceed to adjudication by the arbitrators and accepting the result if favorable to [the respondent], or rejecting it if unfavorable and litigating the matter in court." *Id.* at 419; *see also Cleveland Elec. Illuminating Co. v. Utility Workers Union of America*, 440 F.3d 809, 813 (6th Cir. 2006) (holding that a failure to object to tribunal's ability to arbitrate arbitrability was waiver of that argument in federal court review).

The reasoning of *Halcot* holds even stronger here. The Chinese companies affirmatively presented their desire for the arbitrators to decide arbitrability in its initial petition and developed those arguments over at least three formal submissions. And it agreed at the very first procedural meeting to decide jurisdiction simultaneously with the dispute. It cannot be said that, after starting the whole proceeding, framing the jurisdictional issue, participating for seven years, and never objecting, the companies can *now* come to a U.S. court and claim that this question was not one for the arbitrators to decide.

Accordingly, the Court finds that the question of arbitrability was clearly and unmistakably put before the arbitrable tribunal. It proceeds to a deferential review of the award.

## IV. REVIEW OF THE AWARD

The Chinese companies do not point in their moving papers to any provision of the FAA or the New York Convention as independent grounds to grant vacatur if the Court declined to conduct a de novo review. Nor did the companies specifically reply to Mongolia's arguments arguing against vacatur under any of the New York Convention bases or under section 10(a)(4) of the FAA. The Court could consider such arguments thus waived. *See Brown v. City of New York*, 862 F.3d 182, 187 (2d Cir. 2017) ("The discretion trial courts may exercise on matters of procedure extends to a decision on whether an argument has been waived.")

Instead, it will construe the companies' arguments concerning the accuracy of the arbitrators' decision as a petition to vacate the award under section 10(a)(4) of the FAA. The section provides for vacatur if the arbitrators "exceeded their powers or, so exceeded their authority that the award is meaningless." The Chinese companies' burden to convince the Court that the arbitration should be vacated on this ground is high, and it must be shown that the tribunal's award did not "draw its essence" from the agreement to arbitrate. *See ReliaStar Life Ins. Co. of N.Y. v. EMC Nat. Life Co.*, 564 F.3d 81, 85 (2d Cir. 2009). Otherwise, the Court will uphold the award so long as it offers a "barely colorable justification for the outcome reached." *Id.* at 86 (internal quotation omitted).

The tribunal's analysis, as detailed above, easily passes the deferential standard of review before this Court. The Court does not express an opinion on the accuracy of that analysis. *See id.* at 86 (cautioning courts to "not consider whether the arbitrators correctly decided the issue." (internal quotation and alteration omitted). But the Court finds that the multiple justifications the arbitrators provided for their jurisdiction to be well beyond colorable and, given that the analysis was almost entirely based on the text of the treaty, surely drawn from its essence.

## V. CONCLUSION

For the foregoing reasons, the Court DENIES the Chinese companies' petition to vacate the award and confirm arbitration. It GRANTS Mongolia's cross-petition to confirm the award. The Clerk of Court is respectfully directed to close the case.

It is SO ORDERED.

Dated: November 19, 2019
        New York, New York

                                                   Edgardo Ramos, U.S.D.J.